**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

OCT 0 4 2007

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

CARROLL JOE PARR,

      Petitioner,

    VS.

NATHANIEL QUARTERMAN,
Director, Texas Department of Criminal
Justice, Institutional Division,

      Respondent

Cause No. W-06-CA-317

DEATH PENALTY CASE

## PETITION FOR HABEAS CORPUS

COMES NOW Carroll Joe Parr, Petitioner in the above captioned cause and

pursuant to 28 U.S.C. § 2254 submits to this Court his Petition for Habeas Corpus, as

follows:

## PROCEDURAL HISTORY

Petitioner was charged by indictment with the felony offense of Capital Murder.

He entered a plea of not guilty and a jury trial commenced on May 3, 2004, in the 54th

District Court of McLennan, Texas, the Honorable George H. Allen, presiding. The jury

found Mr. Parr guilty, and the case proceeded to the punishment phase. There, the jury

answered special issue number one affirmatively, and then found there were no mitigating

factors sufficient to warrant a life sentence.  Based on those findings, Petitioner was

sentenced to death by lethal injection.  In an unpublished opinion, the Texas Court of

Criminal Appeals affirmed the capital murder conviction and death sentence.  Parr v.

State, 2006 WL 1544742, *4 (Tex. Crim. App. June 7, 2006) (not designated for

publication).  Mr. Blue timely filed petition for a writ of habeas corpus in the convicting

court and the Texas Court of Criminal Appeals denied relief.  Ex parte Parr, 2006 WL

2879762, *1 (Tex. Crim. App. Oct. 11, 2006). The Petitioner has exhausted all of his

remedies in the state court system and therefore sets forth his claims for relief as follows:

## FIRST CLAIM FOR RELIEF

### THE STATUTE UNDER WHICH PETITIONER WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL VIOLATING THE EIGHTH AMENDMENT AS INTERPRETED IN PENRY V. JOHNSON BECAUSE THE MITIGATION SPECIAL ISSUE SENDS MIXED SIGNALS TO THE JURY THEREBY RENDERING ANY VERDICT REACHED IN RESPONSE TO THAT SPECIAL ISSUE UNRELIABLE.

The following facts are in support of this claim:

Petitioner's facts and circumstances are remarkably similar to those seen in the

recent case of Coble v. Quarterman, 496 F.3d 430 (5th Cir. 2007).  In this case,

Petitioner's "Second Main Charge to the Jury" had the following special issues:

### SPECIAL ISSUE ONE:

Is there a probability that the defendant, Carroll Joe Parr, would commit criminal acts of violence that would constitute a continuing threat to society? Answer: We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "YES." . . . OR Answer: We, the Jury, because at least ten (10) jurors have a reasonable doubt as to the probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, determine that the answer to this Special Issue No. 1 is "No." In the event the jury is unable to agree upon an answer to Special Issue No. 1 under the conditions and instructions outlined above, the presiding juror will not sign either form of answer to the Special

Issue.  You are further instructed that if the jury makes an affirmative finding to Special Issue No. 1, that is, an answer of "Yes", then the jury shall answer Special Issue No. 2 below.[1]

### SPECIAL ISSUE TWO:

You are further instructed that if the jury makes an affirmative finding to Special Issue No. 1, that is, an answer of "Yes", then the jury shall answer Special Issue No. 2 below.  You will answer the Special Issue No. 2 "Yes" or "No."  You may not answer the issue "No" unless all jurors agree to such answer, and you may not answer such issue "Yes" unless ten (10) or more jurors agree to such answer.  The jury, however, need not agree on what particular evidence supports an affirmative finding on this Special Issue. You are instructed that the term "Mitigating Evidence," as used herein, means evidence that a juror might regard as reducing the defendant's moral blameworthiness. The Special Issue, with forms for answer, is as follows: Special Issue No. 2 Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed? Answer: We, the jury, unanimously find and determine that the answer to this Special Issue is "No."

Thus, the same error that affected the Coble trial are present here, that being that the Texas "special issue" interrogatories, submitted during the punishment phase of his capital murder trial, deprived the jury of an effective vehicle to consider mitigating evidence violating the mandate in Penry I and Penry II, thus violating the Sixth, Eighth, and Fourteenth Amendments.  Coble, 496 F.3d at 442.  To impose a capital sentence under the version of the Texas statute in force when Mr. Parr was tried, the jury had to answer two questions in the affirmative. The first special issue interrogatory addressed

---

[1]    2 CR 320.

whether the defendant had acted "deliberately and with the reasonable expectation that the death of the deceased or another would result." The second special issue question instructed the jury to consider "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."[2] Coble, 496 F.3d at 442.

The United States Supreme Court recently issued two decisions dealing with the Texas special issues: Abdul-Kabir v. Quarterman, 127 S. Ct. 1654 (2007), and Brewer v. Quarterman, 127 S.Ct. 1706 (2007). In those cases, the Supreme Court confirmed that its precedent "firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." Abdul-Kabir, 127 S.Ct. at 1664; Coble, 496 F.3d at 433. Thus, in order to prevail, petitioner must show that (1) "his mitigating evidence of mental illness and troubled backgrounds satisfied 'low threshold for relevance' articulated by the Supreme Court,"[3] and (2) the instructions,

---

[2]    The special issues are set out in TEX. CRIM. PROC. CODE ANN. art. 37.071. The third special issue, which is not relevant to this analysis, addresses whether the defendant's conduct was a reasonable response to the provocation, if any, of the victim. Coble, 496 F.3d at 442 (citing TEX. CRIM. PROC. CODE ANN. art. 37.071(b)(1)-(3) (Vernon 1981).

[3]    Coble, 496 F.3d at 444 (citing Tennard v. Dretke, 542 U.S. 274 (2004)).

pursuant to Eight Amendment requirements, allowed the jury to "be able to consider and give effect to the defendant's mitigating evidence."[4]

In fact, the instructions given in this matter, Penry and Coble are virtually identical:

**PENRY:**

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues.[5]

**COBLE:**

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider the mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the Defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve,

---

[4]     Coble, 496 F.3d at 444 (citing Boyde v. California, 494 U.S. 370, 377-78 (1998)).

[5]     Coble, 496 F.3d at 443 n.8 (citing Penry II, 532 U.S. at 789-90).  The Supreme Court held in Smith v. Texas, 543 U.S. 37 (2004) that substantially similar jury instructions as those provided in Penry II were constitutionally inadequate.

and thereafter give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence rather than a death sentence is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one or more of the special issues under consideration.[6]

## PARR

You are instructed that when you deliberate on the questions posed in the Special Issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the Defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instablibility, intelligence, or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the Special Issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by an affirmative finding to the issue under consideration, rather than a death sentence is an appropriate response to the personal culpability of the defendant, an affirmative finding should be given to that Special Issue under consideration.[7]

### A. Petitioner's troubled background sufficiently satisfied 'low threshold for relevance' articulated by the Supreme Court.

The meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard-any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it

---

[6]    Coble, 496 F.3d at 443 n.10.

[7]    2 CR 314-15.

would be without the evidence. <u>Tennard</u>, 542 U.S. at 284. As such, relevant mitigating

evidence is evidence which tends logically to prove or disprove some fact or circumstance

which a fact-finder could reasonably deem to have mitigating value. <u>Tennard</u>, 542 U.S. at

284. Thus, a State cannot bar "the consideration of . . . evidence if the sentencer could

reasonably find that it warrants a sentence less than death." <u>Tennard</u>, 542 U.S. at 285.

Here, Mr. Parr's childhood was pockmarked by extreme poverty and violence, both

directed at him and as a constant presence around him. He had no support, either from

his immediate or extended family. No one else stepped into to assist from the "outside."

> 1.    *He started in the womb inundated with alcohol, which continued*
> *on into early childhood.*

Before even making it into this World, Mr. Carroll Joe Parr was poisoned by his

mother. Gloria Parr, the sister of Petitioner stated her mother, Betty Parr became

pregnant when she was around seven and one-half years old. 21 RR 14. Her mother

drank constantly during her pregnancy with Mr. Parr, consuming either a six pack of beer

or a "half pint of Seagrams or Black Velvet" every day. 2 RR 14-15. His mother's

pattern of drinking would continue through the years of living with his parents. Luckily,

the early alcohol abuse of his mother did not result in fetal alcohol syndrome. 21 RR 72.

However, it certainly stunted brain development. "Common sense tells you that you that

can't have maternal drinking at that level and not have, again, a pernicious effect on the

developing fetus." 21 RR 72. Even if Petitioner's dodged the bullet of his mother's

neglect in the womb, he was unable to do so after birth.

Alcohol also became a focus with his relationship with his father. His father "took him sort of as his protégé to the bars and dressed him up as a little cowboy and made him his sidekick." 21 RR 87. Beginning at the age of five, Petitioner not only was taken to the bar with his father, but also drank regularly as a "five-, six-, seven-, eight-year-old child." 21 RR 87.

### 2. "They hit each other every day."

An everyday occurrence was the yelling, shouting, and beatings between the adults in Mr. Parr's life. Petitioners' mother and father hit each other "everyday." 21 RR 16.[8] "Typically," the confrontations were typically fist fights. 21 RR 18. However, above the din of the general level of disorder in the Parr home, a few events rose above and beyond.

Cheating on each other brought the worst out of each parent in the Parr household. Following an accusation by Mr. Bobby Parr that his wife was cheating on him,[9] he began pointing a .22 rifle at his wife. He then moved aim to the television set showing "Baretta." A shot was fired at the "parrot sitting on Barretta's [sic] shoulder." 21 RR 18. However, Mr. Parr apparently did not live by his "rules." He conducted an open sexual affair with the sister of his wife, Erma Brown. Ms. Gloria Parr testified that she saw them in the act of intercourse, and would also see them in bed together on other occasions. 21 RR 21-22. The affair drew the rage of his wife, which resulted in further beatings

---

[8]     Former Mart, Texas Police Officer Sean Swiffle recalled handling "several" domestic disturbance calls, on the frequency of nearly one every two weeks. 21 RR 6.

[9]     21 RR 18-19.

administered to her by Bobby Parr.  21 RR 22-23.  Ms. Parr and Ms. Brown also went to

blows over the affair. 21 RR 48-49

There would be other attacks within the family: Petitioner's father fighting his

brother because Mr. Bobby Parr was beating Ms. Parr[10]; Ms. Parr attacking Bobby Parr

with a machettte.[11]  Mr. Parr was also on the receiving end of these floggings.  At the age

of 13, Petitioner was hit repeatedly with an extension cord because he refused an

instruction by a tutor.  21 RR 58.  Mr. Bobby Parr picked Petitioner up by the ankles, and

"began beating him with the other hand."  21 RR 58.

The violence around him was reinforced by his sister, Gloria Parr who told him

that "she hated him and wished he was dead."  21 RR 29.  Wishing was not all that she

did.  Brought on by sibling jealousy, Ms. Gloria Parr attempted to kill her then infant

brother several times: by throwing him off the porch[12], by trying to smother him,[13] by

getting him to jump into a swimming pool when he was unable to swim.[14]  However, she

later turned into a rescuer of sorts, hiding brothers in a closet.  21 RR 19.  The effects had

already taken their toll--later on Petitioner would just rock and "hit his head against

things" in reaction to the violence.  2 RR 19.

---

[10]    21 RR 49.

[11]    21 RR 50-51.

[12]    21 RR 27.

[13]    21 RR 27.

[14]    21 RR 27-28.

There was no escape from the aggression, even at his grandmother's house. While there, Petitioner could still hear the fights between his father and mother and other relatives. 21 RR 20. Nor did the rage end.[15]  Mr. and Ms. Parr continued to rail against each other until Petitioner left the house at the age of "fourteen or fifteen." 21 RR 26.

### 3.    The smell of dead rats; dirt for dinner.

Although Officer Swiffle did not recall making an arrest as a result of his disturbance calls at the Parr home, he was able to recall the condition of the house. 21 RR 7.  "It was normally very dirty, really foul odors . . . the smell of dead animals, dead rats" 21 RR 7-8.  Typically, the gas and/or electricity was turned off. 21 RR 30.  The plumbing in the house was not working, so water was brought in through a hose. 21 RR 48. Another water supply alternative was that his parents would send him to the local store to fill up milk jugs with water. The jugs were used to flush the toilet, to cook, and to eat and to drink. "And he was humiliated and made fun of when he went to the convenience store. And he just wouldn't go home because that was what he had to do." 2 RR 81.  A typical meal would consist of eating dirt gathered from a nearby creek that had been baked. 21 RR 47.

---

[15]       Suffice it to say that Petitioner witnesses several beatings occurring between this mother and his father. See, e.g., 21 RR 51-57.

4.     *"This defendant was considered to be the victim of the extreme – the abuse that comes from witnessing and not being sheltered from extreme and chronic domestic violence."*

Although Petitioner was rarely physically abused, he was termed to be the victim of "child abuse by proxy." Dr. Kate Allen, LCSW, Ph.D. told the jury that this type of child abuse is routinely "exposed to extreme violence between the caregivers." 21 RR 71. This violence would typically involve the use of weapons "more often than not." 21 RR 71.

a.     *He became an adult at 11.*

Abandoned by everyone, Petitioner was compelled to become an adult. "He emancipated himself gradually between the ages of nine and eleven. "There were powerful forces forcing him out of his home. There were no utilities, no food, and extreme violence. It was not a place to go home to. And then there were powerful forces in his block, in his community, pulling him out into the street life and showing him how to survive. And there was considerable mentoring, including some help in reading and writing, that he got on the streets or in jail that he didn't get at home." 21 RR 80-81.

At the age of eleven, he was making his own living and to some level feeding his parents." 2 RR 80. Thus, the streets then sort of become his family. "[H]e learned to make it on the streets, to live on the streets, literally to sleep on the streets. And then pretty soon he learned how to save his money. The dealers in the neighborhood taught him to save his money such that he could buy a car with eight hundred dollars. I don't

remember how old he was. He never got a driver's license because he couldn't read or

write. But he could earn money, and they helped him save money so that he could buy a

car. My understanding is he was not a major user of drugs. He certainly was more

interested in the sale of drugs . . . But he was able to make good money and to take care

of himself. He gave his mother money and told her don't let his father know that she had

the money. He bought them food. He bought clothes and gifts -- incidentally, educational

gifts only -- for his children. So he tried to sort of be the father he didn't have. And he

tried I think to make his sister the next best figure, stand-in for his mother, telling her

recently that he did not know what he could do, he couldn't go on if anything happened to

her." 21 RR 81, 88-89.

### b.      The early years were simply emotional scorched earth.

Alcohol was not the only chemical affecting Petitioner during these formative

years.  The constant warfare in Petitioner's home resulted in "constant stress."  This in

turn produced toxins involving the "fight or flight reaction."  21 RR 72.  A combination

of brain chemicals adrenaline and cortisol resulting from the chronic battles of the Parr

household literally "shrunk his brain." 2 RR 74.  "They make the brain grow not as fast

and smaller." 2 RR 74.  The more dramatic and lasting effect were Petitioner's ability to

solve "his emotional reactions," resulting in post traumatic stress syndrome.  2 RR 74.

The results were devastating. "The brain shuts down and does not learn to generate an

alternative set of choices or options when a person feels threatened.  Now, you hear about

post traumatic stress disorder, or PTSD, very often in the area of Vietnam veterans

returning home from combat. And you sometimes hear about it with victims of domestic

battery. But we also know that when any human being is overwhelmed in their

developmental stage with the threat of violence, the brain will again shut down and

develop a rigidity of ability to problem solve and make choices. You will have impulsive

behavior. The studies show us that these children are likely to misinterpret the facial

expressions and body language of people when they are neutral. When that

communication or the verbal communication or body expressions are not threatening or,

neutral, these children will perceive it as threatening. So their perceptual brain is

impaired, and then their responses are impaired." 2 RR 75.

Failed already by both parents in their inability provide any emotional stability

through simply not beating and savaging each other, he was further failed by his mother.

The most important part of the birth process is the mother-child bond. 21 RR 75.

Typically, the first nine months are the critical time. 21 RR 76. However, a "stand in

parent" can emerge as last as three years into the child's life. This is a person who

"would come in and be what we call the constant parent, the constant loving object who

would cradle the child, be the person who fed the child, who would be the person for

example that the child would run to when a stranger enters and they would typically be

afraid . . ." 21 RR 76. However, no one stepped into the void. "In the history I could find

no one. The maternal grandmother was kind of the person that the grandchildren went to

and very often stayed with, and very often they ate I think at her home. But according to Mr. Parr's sister, there was a lot of violence of the same type going on in the maternal grandmother's home. 21 RR 76.

Even the neighborhood failed to help—"there was never any official protection given to [Petitioner] because his father was a very intimidating figure in the neighborhood. People were simply afraid of him." 21 RR 77. And so it seemed, everyone in the family understood that the hostilities were a way of life, "and you simply kept it to yourself." 2 RR 78.

Despite the distance of his mother emotionally, her death had dramatic consequences on Petitioner. His mother was someone who couldn't protect him, and he could not protect her. 21 RR 88. "I am sure he has some ambivalent feelings about not being protected by his mother. But also with her death in the year 2000, a multitude of severe, grief-related feelings occurred. He says and his family members state after her death that he paid for the burial, that he paid for the headstone because his father was not going to have a headstone, and he buried her with her maiden name. And he then has said and has been described as when he was not incarcerated, every single day he went to her grave and laid at the bottom of her grave, laid on her grave. The mourning and the grief for his actual mother as well as the mother he never had is severe in his life. And once you are eleven and you are having to be an adult, you can no longer let those feelings

anywhere near the surface because you feel like you just won't get up one day." 21 RR 88.

Betrayed by his own family, both nuclear and extended, societies net failed him also. No help was coming from the police, teachers, and even Child Protective Services. "Now, of course, that really is not the way it is supposed to work. The safety net is not supposed to work that way. You would think that family members would be the first line of calling for protective safety for the children. You would think of neighbors and community members. You would think of teachers. And then lastly you would think of police officers themselves who saw the conditions and knew the family. Any and all of the members of those groups could have and should have made calls to Child Welfare Services." 21 RR 78.

Education was another area of failure, as Petitioner is "functionally illiterate." This term is used, not that he cannot right and write at all, but his reading and writing ability is so low that it makes him have to avoid at any price he can situations that require him to be able to read and write. 21 RR 79. The bungling of Petitioner's educational placement caused further damage. Labeled "special education," he was forced to ride the bus with other learning disabled children. "Because he was not mentally retarded and because many of the children as he said actually drooled and he was in the same classes with children who drooled, he believed that he was so slow or not smart. And because he

couldn't read or write, this was a very internally distressing situation." 21 RR 86.

### c.    *Even the juvenile justice system fails him.*

At the age of fourteen, Petitioner was placed into the Bill Logue Juvenile Justice Center in Waco, Texas.  A new father,[16] he was not given any type of assistance.  "I read an excerpt which showed that he was a very anxious, impulsive child; that he could be angry and aggressive. No surprises there. But there is no record of any informal or formal treatment plan, any therapy, any counseling, any mentoring, any medication, any testing, any assessment, any prognosis, any follow-up plan. Because of his functioning, if those things been provided they would have clearly pointed to the fact that he needed to go into a surrogate home, whether that be a residential treatment center, group home, or foster home. But the last place he should have been released to during the time that he still could have been helped was the street or family." 21 RR 82-83.

### d.    *The combined effects of the horrific childhood manifested itself into life choices that "just happen."*

The psychiatric literature is that children "like this believe that life just happens. They call it the locus of control. Do you believe that control in life is outside of you or inside of you. And we know that people who are most successful in this country today are people who believe and feel and can operate no matter their circumstances in their lives that the locus of control in their life resides largely with them. Very often whenever they

---

[16]      21 RR 83.

come to a brick wall with that, they will turn to God or a higher power. And that's the way successful people very often live with the vagaries of life." 21 RR 90.

### 5. *Throughout all of this, Mr. Parr remains a compassionate person.*

Far from the homicidal machine portrayed by the State, Mr. Parr maintained a merciful person. According to the mothers of his children, he "was very generous with the money that he made. And he has said and showed through his actions of gift-giving that he did not have the chance for education to save him, and he is not going to let that happen to his own children. So I am told that he refused to give them toys, and gave them plenty of money with the stipulation that it was to go for books and educational toys only. So there are signs that he was trying to make a difference in the next generation." 21 RR 90.

### 6. *The mitigating evidence in Coble.*

According to this court, during the sentencing phase of the trial, Coble offered a variety of mitigating evidence. During the sentencing phase of his trial, Coble offered "a variety of mitigating evidence." Coble, 496 F.3d at 445. First, he presented non-psychiatric mitigating evidence, including evidence of his troubled childhood; that his father died before he was born; that his mother suffered a nervous breakdown when he was eleven; and that he was sent to live at a state facility. Coble, 496 F.3d at 445. Coble lived at the orphanage until he was seventeen, at which point he joined the Marines and served in Vietnam. Coble, 496 F.3d at 445. During his four years of service, Coble

served as a machine gunner and was involved in combat. <u>Coble</u>, 496 F.3d at 445. Upon

his return to the United States, Coble was hospitalized due to the trauma he experienced

during the war. Likewise, Coble's sister testified that he was different after he returned

from Vietnam. <u>Coble</u>, 496 F.3d at 445. Coble offered testimony that he was involved

with various youth programs over the years, that he had a good relationship with his son,

and that he got along well with co-workers. <u>Coble</u>, 496 F.3d at 445. Coble also served as

a section leader in the U.S. Army reserves, and he offered evidence that he was well

respected. <u>Coble</u>, 496 F.3d at 445. Coble also presented the testimony of two

psychiatrists. <u>Coble</u>, 496 F.3d at 445.

As shown above, Petitioner presented significant and relevant evidence of

mitigation. First, Petitioner's troubled childhood evidence "is relevant for mitigation

purposes." <u>Smith v. Texas</u>, 543 U.S. 37, 45 (2004). Furthermore, as instructed by the

Court, "[t]here is no question that a jury might well have considered petitioner's IQ scores

and history of participation in special-education classes as a reason to impose a sentence

more lenient than death. Indeed, we have held that a defendant's IQ score of 79, a score

slightly higher than petitioner's, constitutes relevant mitigation evidence." <u>Smith</u>, 543

U.S. at 45. Moreover, the court has acknowledged that mental health evidence is

potentially mitigating. <u>See</u> <u>Bell v. Cone</u>, 535 U.S. 685, 708 (2002).

**B.    Because Petitioner's proffered evidence was relevant, the Eighth Amendment required the trial court to empower the jury with a vehicle capable of giving effect to that evidence. _Smith_, 543 U.S. at 45.**

Once the low threshold for relevance of the mitigating evidence is met, the 'Eighth Amendment requires that the jury be able to consider and give effect to' [the] defendant's mitigating evidence." Coble, 496 F.3d 430 at 446 (quoting Boyde v. California, 494 U.S. 370, 377-78 (1998)). As the Supreme Court explained in Abdul-Kabir, "sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." Abdul-Kabir, 127 S. Ct. at 1664. This requirement is not satisfied when the jury is unable to express a "reasoned moral response to evidence that has mitigating relevance beyond the scope of the special issues." Nelson v. Quarterman, 472 F.3d 287, 293 (5th Cir. 2006) (en banc)."[A] juror cannot be precluded from electing a sentence less than death if he believes that the mitigating evidence offered makes the defendant less morally culpable for the crime, even if he nonetheless feels compelled to answer the two special issues in the affirmative." Nelson, 472 F.3d at 293. Therefore, "when the defendant's evidence may have meaningful relevance to the defendant's moral culpability 'beyond the scope of the special issues,'" a special instruction is required. Abdul-Kabir, 127 S. Ct. at 1668 n.14.

As in <u>Coble</u>, the question for this Court is whether Mr. Parr's mitigating evidence had meaningful mitigating relevance beyond the scope of the two[17] special issues, such that a special instruction was required. As in <u>Coble</u>, this Court is bound to conclude that it did. <u>Coble</u>, 496 F.3d at 447. The first special issue asked the jury to determine whether the defendant would "commit criminal acts of violence that would constitute a continuing threat to society?" 11 CR 320. The Fifth Circuit found that "Coble's evidence of mental illness and troubled background may have had mitigating relevance to the question of whether Coble would pose a future danger to society, " stating that "it is conceivable that the jury could have given some effect to Coble's mitigating evidence through the future dangerousness special issue." <u>Coble</u>, 496 F.3d at 447. Here, it is certainly conceivable that Petitioner's troubled childhood and mental health evidence held at the same relevance to the jury as it did in <u>Coble</u>.

Although Petitioner's evidence was relevant to the special issues, and the jury may therefore have been able to give partial effect to that evidence in answering the special issues, this Court must conclude that there is a reasonable likelihood that the jury was unable to give meaningful consideration and effect to a major mitigating thrust of Mr. Parr's evidence-its tendency to make him less morally culpable for his crimes-through the special issues. The Texas Court of Criminal Appeals holding to the contrary was an

---

[17]     Mr. Coble's charge contained three issues, the first being a special issue on whether "the defendant had acted 'deliberately, and with the reasonable expectation that the death of the deceased or another would result.'" <u>Coble</u>, 496 F.3d at 447. This is a distinction without a difference.

unreasonable application of clearly established federal law as determined by the Supreme Court. Accordingly, Mr. Parr is entitled to habeas relief on his Penry claim. Coble, 496 F.3d at 448.

## SECOND CLAIM FOR RELIEF

**PARR'S SIXTH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HIS DEFENSE COUNSEL ABANDONED THEIR ROLES AND ALLOWED PARR TO DECIDE WHETHER TO ACCEPT A JUROR THAT DEFENSE COUNSEL HAD DETERMINED TO BE UNSATISFACTORY.**

## THIRD CLAIM FOR RELIEF

**PARR'S SIXTH AMENDMENT RIGHT TO SELF-REPRESENTATION WAS COMPROMISED AND THEREFORE VIOLATED WHEN THE TRIAL JUDGE FAILED TO ADMONISH HIM REGARDING HIS DECISION TO ACCEPT A JUROR THAT DEFENSE COUNSEL HAD DETERMINED TO BE UNSATISFACTORY.**

Billy Foy Sanders was a juror at trial. 9 RR 90. He was a former law enforcement officer who retired as a Captain. 9 RR 76, 81, 83. He was questioned during voir dire about his ability to presume Parr innocent, 9 RR 67, 83-4, and to not hold it against Parr if he exercised his right not to testify, 9 RR 67, 70, and Sanders gave the "right" answers. Also, Sanders had been a victim of burglary and of an attack by someone wielding a tire iron, but he said he could set those experiences aside. 9 RR 74, 78. In addition, Sanders said he would not give an advantage to a law enforcement officer who testified. 9 RR 76. Finally, he said he would not automatically favor the death penalty if Parr was found guilty. 9 RR 78, 85-8.

At the conclusion of Sanders's individual voir dire, there was this exchange:

COURT:            What says the defense as to Billy Foy Sanders?

STATE:            Acceptable.

COURT:            And what says the defense as to prospective juror Billy Foy Sanders?

COUNSEL:          Your Honor, he is acceptable, but I want to put something on the record.

COURT:            All right.

COUNSEL:          Carroll, you – [co-counsel] and I have just talked to you about this last juror that we took. And we both told you that we think this is a form of suicide. We are both one hundred percent against this man, and it was our strong recommendation we not take this man, and you said you want him. Is that correct?

DEFENDANT:        I make the decision to take the last juror.

COURT:            And that is your decision?

DEFENDANT:        Yes, sir.

COURT:            All right. Bring him in.

9 RR 89-90.

## A.    *Trial Counsel were Ineffective for Allowing Parr to Make the Decision.*

It was defense counsel's duty to reject Sanders even if Parr objected. In Florida v. Nixon, defense counsel decided, without the defendant's express consent but without his objection, to concede guilt in this capital murder trial and focus on establishing a case for sparing the defendant's life. Florida v. Nixon, 543 U.S. 175, 178 (2004). The Supreme Court held counsel's decision to not be ineffective assistance of counsel. Nixon, 543 U.S.

at 178. The Court held that a defendant has a right to decide whether to plead guilty,

waive a jury, testify, and take an appeal. Nixon, 543 U.S. at 178, 187. Non-

responsiveness to trial counsel's decisions in these areas does not equate to the

defendant's opposition or contrary decision. Nixon, 543 U.S. at 192. All other decisions

are within the province of defense counsel. Nixon, 543 U.S. at 187. Defense counsel

does, however, have a duty to adequately disclose and discuss trial strategy and other

important decisions with the defendant, and failure to do so may be prejudicial ineffective

assistance. Nixon, 543 U.S. at 178, 187.

     The Sixth Amendment provides for "assistance" of counsel, not just

"appointment" of counsel. United States v. Chronic, 466 U.S. 648, 654-55 (1984).

"Assistance" includes "adequate legal assistance" by an attorney whose competence is

within the range of that demanded in criminal cases. Chronic, 466 U.S. at 655. The Sixth

Amendment is violated when "the process loses its character as a confrontation between

adversaries." Chronic, 466 U.S. at 656-57. Conversely, if there is no effect on the

reliability of the process, the Sixth Amendment is not violated. Chronic, 466 U.S. at 658.

There is a presumption that the assistance passes constitutional muster, and the defendant

has the burden to show otherwise. Chronic, 466 U.S. at 658. But the presumption is

overcome by a countermanding presumption that there has been a violation of the Sixth

Amendment when (1) there is a complete absence of counsel at a "critical stage" of the

proceeding, or (2) defense counsel entirely fails to subject the prosecution's case to

meaningful adversarial testing. <u>Chronic</u>, 466 U.S. at 659. In addition, the countermanding presumption applies when circumstances outside counsel's control preclude adequate assistance of counsel, e.g., wholly inadequate trial-preparation time. <u>Chronic</u>, 466 U.S. at 660-62. In these latter instances, no inquiry into defense counsel's actual performance need be made, and prejudice need not be proven because it is presumed. <u>Chronic</u>, 466 U.S. at 660-62.

Here, defense counsel abdicated their duty to assist Parr by relying on defense counsel's experience in determining that Sanders would make a bad juror. Thus defense counsel abandoned their roles at a critical stage in the trial, i.e., jury selection. <u>Chronic</u>, 466 U.S. at 659. Furthermore, prejudice is presumed. <u>Chronic</u>, 466 U.S. at 660-62.

### B. *The Judge Erred by Failing to Properly Admonish Parr.*

In the alternative, it was the trial judge's duty to make sure Parr's decision was freely and intelligently made. A defendant has the right of self-representation and can reject his Sixth Amendment right to counsel, and thereby he can make these other decisions too. <u>Faretta v. California</u>, 422 U.S. 806, 814-17 (1975). This is an aspect of Fifth Amendment due process and Sixth Amendment right to counsel. <u>Faretta</u>, 422 U.S. at 817-19. Failure to elect to represent himself and acceptance of the assistance counsel shows implied consent to counsel making all decisions other than whether to plead guilty, waive a jury, testify, and take an appeal. <u>Faretta</u>, 422 U.S. at 820-21. If the defendant chooses self-representation, the record should be clear that the defendant's decision is

made voluntarily and intelligently.  <u>Faretta</u>, 422 U.S. at 835-36.  Pertinent areas of inquiry

may include whether (1) the defendant clearly and unequivocally declared to the trial

judge that he wants to represent himself, (2) the defendant does not want counsel, (3) the

defendant is voluntarily exercising his informed free will, (4) the defendant is mentally

competent and understanding of the impact of his decision, and (5) the trial judge has

warned the defendant that (a) the judge believes the defendant is making a mistake and

(b) the defendant will be required to follow the rules of trial procedure.  <u>Faretta</u>, 422 U.S.

at 835-36.  If the record does not establish that the decision was freely and intelligently

made, there was error and harm need not be shown.  <u>United States v. Virgil</u>, 444 F.3d

447, 455-56 (5th Cir. 2006) (applying <u>Faretta</u> and holding that no showing of harm

required).

By making the decision, Parr in effect took over his defense at that moment.  Thus

the judge should have made the inquiries required under Faretta.  There is nothing in the

record to show that this occurred.  This was especially important as the record shows that

Parr's intellectual functioning was in question: he had a low IQ and psychological

disorders.  21 RR 74-106.  His defense counsel had filed a pre-trial motion to have Parr

examined for mental incompetency and insanity.  I CR 76-78.  Thus there was error.

Prejudice need not be shown.  <u>Virgil</u>, 444 F.3d at 455-56.

## FOURTH CLAIM FOR RELIEF

### PETITIONER'S CASE SHOULD BE REMANDED FOR A NEW TRIAL BECAUSE A "VACILLATING" JUROR WAS WRONGFULLY EXCLUDED.

The following facts support this claim:

As set forth by the Court of Criminal Appeals, the described the voir dire between

the attorneys and the potential juror, Roderick Dylan Garrett is set forth below:

When initially questioned by the prosecutor, Garrett explained that he could never recommend a death sentence and would always answer the special issues so that a life sentence would result. He explained that the death penalty was contrary to his religious beliefs. However, when defense counsel questioned Garrett, he agreed that he could put his religious beliefs aside and recommend the death penalty. Thereafter, the prosecutor questioned Garrett about his contradictory responses in the following exchange:

Q.    And so if you were selected as a juror, the Judge would give you an oath that says that you must follow the law.

A.    Uh-huh.

Q.    Okay. And the law would require that you base your verdict on the evidence. But your personal convictions, as I understand them, would require you to say, I don't care what the evidence says, I'm not going to issue a death penalty.

A.    (Nodded head.)

Q.    You're shaking your head yes that you agree with that?

A.    Uh-huh.

Q.    Okay. So you see where there is a conflict between the law and your personal convictions which [are] most precious to you? Your personal convictions or the law?

A.   On my own, I mean, because we have laws, but then, you know, I believe in-

Q.   You've got to live with yourself, right?

A.   Yes, sir.

Q.   So your personal convictions are more important to you than the law?

A.   We've got to have the law.

Q.   Well, which is it?

A.   I don't know.

Q.   Are you going to follow your belief-

A.   I believe in the law. I believe in the law.

Q.   -that you can't give the death penalty?

A.   I believe in the law but I'm still not-I couldn't do one for the death penalty. That's just not-I was brought up better than that.

Even after this exchange, Garrett continued to vacillate in his answer. When defense counsel questioned Garrett about the issue, he reiterated that he could answer the special issues in a way that would result in the death penalty in the "worst of the worst" cases. Subsequently, in response to the trial court's question: "Would you answer [the special issue] truthfully even though you knew that truthful answer would lead to the Court sentencing someone to death?" Garrett answered: "Yes, I could do that." However, in response to the prosecutor's later question if he could answer the special issues in a way that would result in the death penalty, Garrett answered that he could never recommend the death penalty. Finally, when defense counsel asked if he could be truthful in answering the special issues, Garrett answered: "Yes, I'll be truthful, to the best of my ability I'll be truthful."

Parr, 2006 WL 1544742 at *3.

### A.    A "vacillating" juror is not automatically excludable.

As the Court has already observed, the State infringes upon a capital defendant's

right under the Fourteenth Amendment when it excuses for cause a venire member who

express conscientious objections to capital punishment.  See Witherspoon, 391 U.S. at

521-22.  However, a prospective juror may be excused for cause if her views regarding

capital punishment "would prevent or substantially impair the performance of his duties

as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. 38,

45 (1980); accord Wainwright v. Witt, 469 U.S. 412, 424 (1985). The determination as to

whether or not a juror should be stricken for cause is a question of fact.  See Patton v.

Yount, 467 U.S. 1025, 1036 (1984) (rejecting the circuit court's determination that it is a

mixed question of law and fact). "[S]uch a finding is based upon determinations of

demeanor and credibility that are peculiarly within a trial judge's province," Wainwright,

469 U.S. at 428, and therefore courts reviewing such findings on habeas review must

accord them a presumption of correctness.  See Wainwright, 469 U.S. at 428; Patton, 467

U.S. at 1037 n.12, 1038.  To this end, Witt held that the trial court's finding that a

prospective juror could not faithfully and impartially perform her statutory function is a

determination of fact, subject to a presumption of correctness on collateral review. Witt,

469 U.S. at 428, 430; see also Fuller v. Johnson, 114 F.3d 491, 500-01 (5th Cir.) (holding

that a trial court's finding of juror bias is entitled to a presumption of correctness under

both former U.S.C. § 2254(d) and amended 28 U.S.C. § 2254(e)(1)), <u>cert denied</u>, 522 U.S. 963 (1997).

The Court of Criminal Appeals found that "the trial judge's ruling is supported by the record.  Because Garrett vacillated as to his ability to follow the law, we defer to the decision of the trial judge, who was in a position to actually see and hear him in the context of voir dire. The trial court did not abuse its discretion in granting the State's challenge for cause." <u>Parr v. State</u>, 2006 WL 1544742, *4 (Tex. Crim. App. June 7, 2006) (not designated for publication).  This holding is both an untenable application of federal law, and an unreasonable determination of the facts.

In determining whether an unequivocal belief against the penalty has been expressed, the Fifth Circuit has held that "[o]nly the most extreme and compelling prejudice against the death penalty, perhaps only or very nearly a resolve to vote against it blindly and in all circumstances, is cause to exclude a juror on <u>Witherspoon</u> grounds." <u>Burns v. Estelle</u>, 592 F.2d 1297, 1300 (5th Cir. 1979), <u>aff'd</u>, 626 F.2d 396, 398 (5th Cir. 1980) (en banc). The trial court must ascertain that the venireperson who opposes capital punishment can put aside his personal convictions against the sanction and "do his duty" as a juror.  <u>See Witherspoon</u>, 391 U.S. at 515 n.7.  Thus, in <u>Burns</u> the Fifth Circuit held that the trial court could not, without further questioning, exclude a juror merely because she admitted that the death penalty would "affect" her deliberations at the guilt/innocence phase of trial "on any issue of fact," <u>Burns</u>, 626 F.2d at 397-98 & n.2, and noted that even

a "fixed opinion against" the death penalty was not *per se* disqualifying.  <u>Burns</u>, 592 F.2d

at 1299. Similarly, in <u>Granviel v. Estelle</u>, 655 F.2d 673 (5th Cir. 1981), <u>cert. denied</u>, 455

U.S. 1003, 1007 (1982), a venireman's responses that he did not "think" he could vote for

the death penalty, and did not "feel like he could take life in that manner" were

insufficient to constitute a resolve to vote automatically against the imposition of capital

punishment.  <u>Granviel</u>, 655 F.2d at 677.  When there remains any ambiguity about the

juror's unequivocal rejection of the penalty, further questioning is necessary to determine

whether the juror could put aside his opposition.  <u>Burns</u>, 626 F.2d at 398.  Furthermore, in

<u>Williams v. Maggio</u>, 679 F.2d 381 (5th Cir. 1982) (en banc), this Court noted that on

federal habeas review "[c]lose scrutiny of the voir dire examination of each juror" whose

exclusion is now challenged is warranted, to determine whether "the stiff requirements of

<u>Witherspoon</u> and its progeny" are met.  <u>Williams</u>, 679 F.2d at 384, 386.

  In <u>Williams</u>, an excused juror had initially indicated mere uncertainty as to whether

she could return a verdict requiring the death penalty, and had equivocated in her

response to a question as to whether she could ever return such a verdict. Nevertheless, on

examining these responses in the context of the entire voir dire examination of the juror,

the en banc majority concluded that "automatic opposition to the death penalty [was]

established," despite these uncertain and equivocating responses, when they were

"viewed in conjunction with [the juror's] previous statement of clear opposition to the

death penalty." <u>Williams</u>, 679 F.2d at 385.  In reviewing whether the juror could in the

light of her entire voir dire examination be determined to be merely equivocal or

vacillating with regard to the death penalty (rather than unalterably opposed to it), the *en*

*banc* majority rejected the contention that under <u>Witherspoon</u> "exclusion of a venireman

is impermissible unless he states in response to all questions that he absolutely refused to

consider the death penalty." <u>Williams</u>, 679 F.2d at 386 (emphasis added). In affirming

the exclusion of the juror, the court concluded:

> Witherspoon and its progeny do not mandate that a prospective juror aver that
> she would refuse to consider the death penalty in every case that could possibly
> arise. If she knows enough about the case to know that she could not consider
> imposition of the death penalty regardless of what evidence might be
> presented, she must be excused.

<u>Williams</u>, 679 F.2d at 385-86; <u>see also</u> <u>Bell v. Watkins</u>, 692 F.2d 999, 1007-08 (5th Cir.

1982).

Here there is no such showing. The juror unequivocally stated that the death

penalty was a potential in cases where the defendant was one of the "worst of the worst."

<u>Parr</u>, 2006 WL 1544742 at *4. Furthermore, in answer to the trial court and defense

questioning, the juror stated directly that he would truthfully answer the issues even if

those findings would lead to a verdict of death. <u>Parr</u>, 2006 WL 1544742 at *4. Unless a

venireman states unambiguously that he would automatically vote against the imposition

of capital punishment no matter what the trial might reveal, it simply cannot be assumed

that is his position." <u>Witherspoon</u>, 391 U.S. at 516 n.9). "[O]nly a tortured reading of this

transcript" will support any conclusion but the fact that the questioned juror first stated he

would automatically vote against the death penalty, but then said that he could truthfully answer the death penalty questions.  O'Bryan v. Estelle, 714 F.2d 365, 412 (5th Cir. 1983).

The Supreme Court has held that the State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths. "However, the Constitution disentitles the State to execute a sentence of death imposed by a jury from which such prospective jurors have been excluded."  Adams, 448 U.S. at 50-51.  This Court should so hold.

## FIFTH CLAIM FOR RELIEF

### PETITIONER'S RIGHT TO DUE PROCESS AND HIS RIGHT TO FREE FROM CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED BY THE STATE'S USE OF EXTRANEOUS OFFENSES AT PUNISHMENT THAT WAS CLEARLY NOT ESTABLISHED BEYOND A REASONABLE DOUBT.

The following Facts support this claim:

### A.    *Factual Basis.*

The State introduced two separate incidences of alleged offense supposedly committed by Mr. Parr.  The first, a "drive-by" shooting; the second, an unsolved murder. Neither were adequately connected to Petitioner to warrant admission, thus violating the Eighth Amendment.

### 1.    "The drive by."

During the State's punishment case they attempted to establish Petitioner was involved in a drive-by type shooting. Samson Green testified that he was at his sister's house when a shot was fired through the door. Green didn't see who fired the shot, but did testify that Petitioner had been at the house earlier looking for money.  20 RR 48, 52-53.  Waco police detective R.C. Anderson testified that he investigated the incident, and found a bullet hole and shell casing.  20 RR 89-90.  Crime scene technician Serena Lowe document the finding of a loaded AK-47.  20 RR 93-94.  The shell casing was later matched to the AK-47.  20 RR 170-71.

The sum total of the evidence concerning this incident was as follows:

- A shot was fired inside a residence

- Petitioner had been at the house earlier looking for money

- The shot came from a AK-47 that was discarded at the scene.

It is obvious that what was is missing from the evidence is any evidence of who actually fired the shot. Since the evidence was offered against Petitioner, the suggestion was that it was Petitioner who fired the shoot. However, that conclusion was based entirely on speculation. The evidence did not establish Petitioner fired the shot, and certainly did not establish beyond a reasonable doubt that Petitioner was involved.

Petitioner concedes that due process does not prevent the use of extraneous offenses at punishment. However, that does not mean there is no limit on the use of

extraneous offenses. One of those limits is the requirement that extraneous offenses be established beyond a reasonable doubt. In this case, there should be no doubt the state's burden of proof was not met; the inculpatory value of the evidence was based entirely on speculation and conjecture. As such, Petitioner suggests his right to due process has been violated.

### 2.    *The murder.*

The alleged murder of Ronnie Zarazua occurred on December 9, 2001, at location in Waco, McLennan County, Texas. 20 RR 109. A Waco, Texas detective found the body on roadside with "two gunshot wounds to his head" and obvious other gunshot wounds. 20 RR 112. At least some of the shots appeared to be at close range. 20 RR 113-14. Upon developing Petitioner as a potential suspect in this matter, Mr. Parr denied having contact with Mr. Zarazua on the date in question. It was not until January, 2003 that the lead detective learned of new "information" that pointed to Mr. Parr as a suspect. 20 RR 118. Furthermore, the detective learned that Mr. Zarazua was to testify against Milton Cosby, and Cosby's murder trial which was set for the Monday following his death. The murder is considered to be "unsolved." 20 RR 120.

### a.    *Retribution for assaults.*

Allegedly a victim of abuse by Mr. Parr, Dawanna Harrison testified that during their relationship the couple drove by the location of the alleged murder. 20 RR 122. She stated that Mr. Parr made admission that he had to should a person there because he was

going to "testify against his friend" Milton Cosby. 20 RR 123-24.  However, she could not remember the date of the alleged statement, indicating that she "wasn't keeping up with the dates."  Furthermore, Ms. Harrison stated that she did not tell the police of this alleged confession at the time it occurred.

### b.    Whiteside.

Mr. Whiteside, whose testimony was bought and paid for by a plea bargain in this case, also testified concerning this alleged incident.  He states that on the date in question, he Mr. Parr and a unknown Mexican male had met.  During the meeting, Mr. Parr indicated that he was going to "kill him."  After smoking marijuana, Mr. Parr and the Mexican male left. After a possibly 30 to 45 minutes had passed, Mr. Parr returned.  Mr. Whiteside got in the car and was driven to a location where human body was seen in the ditch.  20 RR 130.  The reason for the alleged killing was that Mr. Parr "was keeping it real for his nigger, Milton Cosby."  Another witnesses, Damion Montgomery stated that Mr. Parr told him that Mr. Whiteside had in fact killed Mr. Zarazua.

### B.    State court presentation.

The drive by extraneous offense was presented to the Court of Criminal Appeals on direct review.  That court declined Petitioner's claim. Parr, 2006 WL 1544742 at *4. The murder matter was presented on state writ, and was denied. Ex parte Parr, 2006 WL 2879762, *1 (Tex. Crim. App. Oct. 11, 2006).

### C.     *Argument.*

When a state court admits evidence that is so unduly prejudicial it renders the trial

fundamentally unfair, the Fourteenth Amendment's Due Process Clause provides a

mechanism for relief.  Dawson v. Delaware, 503 U.S. 159, 179 (1992); Bigby v. Dretke,

402 F.3d 551, 563 (5th Cir. 2005), cert denied, 546 U.S. 900 (2005).

Under Texas law, the admission of an unadjudicated extraneous offense is

permitted during the State's case-in-chief in the punishment phase of a trial.  See Jaubert

v. State, 74 S.W.3d 1, 3 (Tex. Crim. App. 2002) (examining the legislative history of

Tex. Code. Crim. Proc. Ann. art. 37.07, § 3(g)); see also Washington v. State, 943

S.W.2d 501, 503-04 (Tex. App.—Fort Worth 1997, pet. ref'd) (noting that § 3(g) was

added in 1993 to permit the state to offer evidence of unadjudicated extraneous bad acts

at punishment proceedings). Allowable under state law, the Fifth Circuit Court of

Appeals has held that "there is no constitutional prohibition on the introduction at a trial's

punishment phase of evidence showing that the defendant has engaged in extraneous,

unadjudicated, criminal conduct." Brown v. Dretke, 419 F.3d 365, 376 (5th Cir. 2005).

Whether such matters can be admitted into the punishment phase is not the

touchstone of Petitioner's claim.  The admission of evidence of an extraneous offense in

the second phase of a Texas bifurcated proceeding must be watched closely and may

implicate constitutional concerns.  Milton v. Procunier, 744 F.2d 1091, 1097 n.5 (5th Cir.

1984), cert. denied, 471 U.S. 1030 (1985).  In habeas actions, a reviewing court is not sit

to review the admissibility of evidence under state law unless erroneous evidentiary

rulings were so extreme as to result in a denial of a constitutionally fair proceeding. Thus,

the erroneous admission of prejudicial testimony does not justify habeas relief unless the

evidence played a "crucial, critical, and highly significant" role in the jury's

determination. Jackson v. Johnson, 194 F.3d 641, 656 (5th Cir. 1999).

The thrust of the decisions on capital punishment has been "that discretion must be

suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious

action." Gregg v. Georgia, 428 U.S. 153, 189 (1976) (opinion of Stewart, Powell, and

Stevens, JJ.). In fact, the United States Constitution does not require that the sentencing

process should be transformed "into a rigid and mechanical parsing of statutory

aggravating factors." Barclay v. Florida, 463 U.S. 939, 950-51 (1983). As long as that

discretion is guided in a constitutionally adequate way, and as long as the decision is not

so wholly arbitrary as to offend the Constitution, the Eighth Amendment cannot and

should not demand more. Barclay, 463 U.S. at 951.

The mere fact that evidence of the defendant's alleged unadjudicated criminal

activity is "sufficiently reliable" to be admitted in evidence at a capital sentencing hearing

does not mean that the jury's sentence based on that evidence necessarily is

constitutionally reliable. The basic requirements of reliability and fundamental fairness

extend to the entire sentencing process. See, e.g., Woodson v. North Carolina, 428 U.S.

280, 305 (1976) ("Because of [the qualitative difference between the death penalty and a

sentence of imprisonment], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."). The crucial Eighth Amendment question is whether the ultimate sentencing decision is reliable, not whether the admission of certain evidence is reliable. Devier v. Zant, 3 F.3d 1445, 1466-67 (11th Cir. 1993).

Assertions by the State at a capital sentencing hearing that the defendant committed crimes for which he has not been convicted are inherently suspect. As the Fifth Circuit has explained, "there remains a long-held reservation about the use of wrongdoing not then being tried. These concerns express our acceptance that a jury suffers the human weakness of blending wrongs--a result inconsistent with our fundamental commitment to charge specificity, jeopardy and due process." Milton v. Procunier, 744 F.2d 1091, 1097 (5th Cir. 1984), cert. denied, 471 U.S. 1030 (1985). In fact, the instruction of beyond a reasonable doubt[18] as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision. Addington v. Texas, 441 U.S. 418, 423 (1979).

---

[18]     The trial court instructed, and the Texas sentencing statute requires that the jury find the extraneous offenses beyond a reasonable doubt before use.

The obvious danger inherent in the admission of extrinsic evidence in the guilt phase is that the jury will convict the defendant, not for the offense charged, but for the extrinsic evidence. United States v. Beechum, 582 F.2d 898, 914 (5th Cir. 1978), cert. denied, 440 U.S. 920 (1979). In fact, evidence of prior unadjudicated conduct is admitted during the penalty phase not to impose punishment for that conduct, but to give the penalty phase jury "*a true picture of the defendant's history* since there is no temporal limitation on evidence in mitigation offered by the defendant." Ayala v. Ayers, 2007 WL 2019538, *6 (S.D. Cal. July 9, 2007) (slip op.). Here, the jury is being asked to decide the literal question of life or death based upon actions unrelated to Petitioner. Even Texas has recognized this danger, holding that "[i]t is necessary, however, that evidence of any extraneous transactions is shown to be relevant and that the accused actually participated in the extraneous offense." Burks v. State, 876 S.W.2d 877, 909 (Tex. Crim. App. 1994).

This Honorable Court is "not at liberty to assume that items given . . . emphasis by the sentencing court did not influence the sentence which the prisoner [received]." Townsend v. Burke, 334 U.S. 736, 740 (1948). Protecting against the arbitrary imposition of the death penalty "must not become simply a guessing game played by a reviewing court in which it tries to discern whether the improper nonstatutory aggravating factors exerted a decisive influence on the sentence determination. The guarantee against cruel and unusual punishment demands more." Henry v. Wainwright, 661 F.2d 56, 59-60 (5th Cir. [Unit B] 1981). Where a life is at stake, the risk that a particular defendant has

been selected for the wrong reason is unacceptable and incompatible with the Eighth and Fourteenth Amendments. See Lockett, 438 U.S. at 605. Given the "extraordinary measures" that the Court has undertaken to guarantee "as much as is humanly possible" that a death sentence has not been imposed by "mistake,"[19] a remand for resentencing is the least that is required.

## SIXTH ISSUE FOR RELIEF

**THE TEXAS COURT OF CRIMINAL APPEALS' DECISION THAT THE EVIDENCE SUPPORTING AN AFFIRMATIVE FINDING TO THE SPECIAL ISSUE INQUIRING ABOUT "FUTURE DANGEROUSNESS" WAS SUFFICIENT WAS CONTRARY TO, AND INVOLVED AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL CONSTITUTIONAL LAW, AS DETERMINED BY THE SUPREME COURT OF THE UNITED STATES.**

The following facts support this claim:

At issue eight of his direct appeal brief to the Texas Court of Criminal Appeals, Mr. Parr complained that the evidence was insufficient to support the jury's affirmative answer to the special issue inquiring into future dangerousness, citing applicable Texas case law. See, e.g., Petitioner's Br. at 48 (citing Keeton v. State, 724 S.W.2d 58 (Tex. Crim. App. 1987). The Court of Criminal Appeals denied this claim. Parr, 2006 WL 1544742 at *1-*2.[20]

---

[19]     Eddings, 455 U.S. at 118 (O'Connor, J., concurring).

[20]     The facts of the alleged offense as set forth by the Court of Criminal Appeals are found at this citation also.

This Court may grant habeas relief only where the decision of the state court decision is contrary to, or involves an unreasonable application of clearly established constitutional law. Petitioner will argue that the state court has made an unreasonable application of the established constitutional principles that govern capital sentencing. Under § 2254(d), the limited question before this court is whether the CCA's decision to reject the sufficiency of the evidence claim in regard to future dangerousness was an objectively unreasonable application of the clearly established federal law set out in Jackson v. Virginia, 443 U.S. 307 (1979). Martinez v. Johnson, 255 F.3d 229, 244 (5th Cir. 2001).

Changes in the legal landscape complicate application of the familiar constitutional principles of Jurek. Since Jurek, the Texas Legislature has made constitutionally significant amendments to the Texas statutory scheme in response to Penry v. Lynaugh, 492 U.S. 302 (1989) and Simmons v. South Carolina, 512 U.S. 154 (1994). The Texas Court of Criminal Appeals has applied its judicial gloss to the amended capital sentencing scheme. The Supreme Court of the United States has not yet issued an opinion in a case, like this one, arising from this new landscape.

Arave v. Creech, 507 U.S. 463 (1993) and cases cited clearly establish that capital sentencing aggravators may not be too vague. Texas law deems the future dangerousness special issue to be an aggravator that must be proved in every case. Blue v. State, 125 S.W.3d 491 (Tex. Crim. App. 2003). A state court's construction of its own law is

authoritative.  Mullaney v. Wilbur, 421 U.S. 684, 691 (1975).  Osborne v. Ohio, 495 U.S. 103 (1990) clearly establishes that a constitutional defect in a state statute may be raised in the manner employed by Mr. Parr's direct appeal counsel--by asserting a failure of proof of omitted but constitutionally necessary elements.  In addition, Ring v. Arizona, 536 U.S. 584 (2002) clearly establishes that a federal court may require proof of elements not present, but constitutionally required, in a state's capital sentencing scheme.

In reviewing the sufficiency of the evidence at punishment, the Court of Criminal Appeals purports to examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have believed beyond a reasonable doubt that petitioner would probably commit criminal acts of violence that would constitute a continuing threat to society.  Parr, 2006 WL 1544742 at *1.  As further factors to be considered under this test, the Court of Criminal Appeals has found the following factors to be relevant:

- The circumstances of the offense.  Martinez v. State, 924 S.W.2d 693 (Tex. Crim. App. 1996).

- Evidence showing "an escalating pattern of disrespect for the law" can be used to support a finding of future dangerousness. King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

- Future dangerousness can also be supported by evidence showing a lack of remorse and/or indicating an expressed willingness to engage in future violent acts. Rachal v. State, 917 S.W.2d 799, 806 (Tex. Crim. App. 1996), cert. denied, 519 U.S. 1043 (1996).

- We have also consistently held that the jury considers both free society and prison society in determining future dangerousness.  Morris v.

State, 940 S.W.2d 610, 613 (Tex. Crim. App. 1996), cert. denied, 520 U.S. 1278 (1997).

However, the length of a defendant's incarceration is not relevant to this issue. *Id.*

The factors identified by the court are intended to focus on incorrigibility. The court has acknowledged that the ultimate penalty must be reserved for those view incorrigibles who pose such a threat to society that they cannot be incarcerated without fear of future violent outbursts toward others. Nobles v. State, 843 S.W.2d 503 (Tex. Crim. App. 1992). The focus for the most part must be on the defendant's conduct in prison. There was some evidence that petitioner had been a problem in prison. However, most of the incidents involved discipline problems; few involved physical violence. Again, the focus is not whether petitioner would be a discipline problem, but on whether there is some chance he would commit violent acts while incarcerated. Petitioner suggests there was simply not enough evidence to support an affirmative answer to that question.

Furthermore, under the Texas statute, a Texas jury may sentence a capital defendant to death where the probability of his commission of criminal acts of violence is extremely low–one percent certainty is within the literal meaning of the word *probability*. The jury need not believe that the predicted *criminal acts of violence* will be serious, or even that the predicted criminal acts will result in bodily injury or death. Property damage caused by violence is sufficient to meet the literal terms of the statute. Further, the threat predicted by the sentencing jury need not continue for a substantial period of

time to meet the literal terms of the Texas statute. Five minutes and fifty years fit equally well within the literal terms of the Texas statute.

Finally, the statute inquires whether the capital defendant ***would*** commit criminal acts of violence that would constitute a ***continuing threat to society***. The literal terms of the Texas statute allow the sentencing jury to consider and predict what the defendant would do if he were not kept in confinement at all, but released into free society. Mr. Parr submits that proof of the following elements, (or their functional equivalents), are constitutionally required to impose death as a penalty based on the Texas future dangerousness aggravator:

1. A high probability of future dangerousness, at least 95%, but if this degree of certainty is not deemed necessary to avoid arbitrariness and capriciousness, then some other degree of certainty in excess of 51%.

2. The predicted criminal acts of violence must be serious, deliberate acts that result in serious bodily injury or death. Property damage caused by violence is insufficient to meet the demands of the constitution.

3. To meet the demands of the constitution, the threat predicted by the sentencing jury must be one that continues for a substantial period of time during the defendant's confinement in the penitentiary.

4. The continued threat element must take into account the 40 years of parole ineligibility during which time the capital defendant will be confined in the penitentiary.

In sum, to impose death based on this aggravator, the capital sentencer must be very confident that the defendant will be so incorrigible that he will be a threat to life or

limb, even in prison, or that a high level of threat will continue past the 40 year period of parole ineligibility in the event of release from prison.

The Supreme Court precedents make clear that a State's capital sentencing scheme also must genuinely narrow the class of defendants eligible for the death penalty. Zant v. Stephens, 462 U. S. 862, 877 (1983). When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the Supreme Court requires that the circumstance must provide a principled basis for doing so. See Lewis v. Jeffers, 497 U. S. 764, 776 (1990); Godfrey v. Georgia, 446 U. S. 420, 433 (1980). If the sentencer fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty, the Supreme Court deems the circumstance constitutionally infirm. See Maynard v. Cartwright, 486 U. S. 356, 364 (1988) (invalidating an aggravating circumstance that "an ordinary person could honestly believe" described every murder); Godfrey, 446 U. S. at 428–29 ("A person of ordinary sensibility could fairly characterize every murder as `outrageously or wantonly vile, horrible and inhuman'").

Mr. Parr argues that the future dangerousness special issue submitted to his sentencing jury omitted elements constitutionally necessary to impose death. The opinion of the Texas court charged with judicial review of the death verdict makes it clear that it did not require convincing proof that Mr. Parr will be so incorrigible that he will be a threat to life or limb, even in prison, or that a high level of threat will continue past the 40

year period of parole ineligibility in the event of release from prison. The Texas court's opinion makes no attempt to demonstrate how the record evidence convincingly proves that Mr. Parr would be a serious threat to others in prison. The Texas court's opinion also fails to make it clear whether the continuing threat prediction is to be made upon the assumption that Mr. Parr will be confined in the penitentiary for at least 40 years and in fact, does not use this factor whatsoever.

Mr. Parr says that his position before the Texas court was correct on this issue. He has not been shown to be a continuing threat to society in the constitutional sense. The Texas court simply does not interpret its statute in a manner that will meet the demands of the constitution.  See Martinez, supra.

Mr. Parr was a young man at the time this crime was committed. This record does not show any serious misconduct in jail or prison, the only society he will know for at least 40 years. It was objectively unreasonable for the Texas court to conclude that Mr. Parr cannot be safely incarcerated over a 40 year period, or that he will pose a serious threat to free society if later released into free society.

The recent Texas case of Berry v. State, 2007 WL 1489797 (Tex. Crim. App. May 23, 2007) (slip op.) demonstrates the arbitrary and capricious way the Texas system operates without the definition of terms and phrases suggested here. In Berry, where the defendant had been sentenced to death for killing her infant child, the Texas court reformed the death sentence to life on the following rationale:

We hold that the state did not meet its burden of proving beyond a reasonable doubt that there is a probability that petitioner, if allowed to live, would commit criminal acts of violence in the future so as to constitute a continuing threat, whether in or out of prison.   Petitioner murdered one child and abandoned another, but defense witnesses testified that these two incidents were out of character and that she was a loving and caring mother to her other three children. Petitioner's expert witnesses opined that she was depressed and under extreme stress when she killed Malachi and, five years later, abandoned Paris. She had no criminal record, and the state presented no other evidence of violence in her past. All of her offenses involved a pregnancy, but testimony from both defense and state witnesses showed that her potential for becoming pregnant while incarcerated would be "extremely low." Further, petitioner was in her twenties when she was convicted of capital murder. If she received a life sentence and were paroled forty years later, she would be in her sixties and likely beyond her childbearing years and thus could not repeat such an offense.

Berry, 2007 WL 1489797 at *13.

Mr. Parr suggests that his crime and his background are no worse than those described in the Texas cases where the Texas court reformed death sentences to life. There does not appear to be a principled reason why these defendants were permitted to live, while Texas says he must die.

In Penry v. Lynaugh, 492 U.S. 302 (1989) (Penry I) the majority observed that Jurek reasoned that the former Texas statute's constitutionality "turns on whether the enumerated questions allow consideration of particularized mitigating factors." 428 U.S., at 272 . Although the various terms in the special questions had yet to be defined, the 1976 joint opinion in Jurek concluded that the sentencing scheme satisfied the Eighth Amendment on the assurance that the Texas Court of Criminal Appeals would interpret the question concerning future dangerousness so as to allow the jury to consider whatever

mitigating circumstances a defendant may be able to show, including a defendant's prior criminal record, age, and mental or emotional state.  Penry, 492 U.S. at 317.

Mr. Parr says those Jurek assurances have never come to fruition in the 31 years since that decision.  Neither the Texas court or the Texas Legislature have required definitional jury instructions such as those described here. Mr. Parr anticipates that opposing counsel may suggest that the promises of Jurek were fulfilled by the enactment of the Penry amendments providing for the separate special issue inquiring into mitigation.

Mr. Parr would argue here, as he does elsewhere in this petition, that the failure of Texas  to assign, at the mitigation hearing, any burden of proof and persuasion to any party, and the "moral blameworthiness" limiting instruction, so disable the mitigation special issue as a vehicle for handling mitigating circumstances, that the promises Texas made in Jurek remain unfulfilled.  As a result, Mr. Parr has been sentenced to die on evidence that is insufficient to establish that he meets the minimum constitutional standard for the future dangerousness aggravator.

Mr. Parr maintains that this has occurred because the Texas system does not afford him an adequate vehicle to demonstrate the existence of the mitigating circumstance that he is not a continuing threat to society.  The Texas system, even after the Penry amendments, is directly contrary to the principles that underlay Jurek.

The CCA has previously rejected this argument in Mr. Parr's case.  However, that

decision is not controlling because the state court's decision directly conflicts with the

U.S. Supreme Court's decisions in <u>Jurek</u> and <u>Penry v. Lynaugh</u>.  Therefore, the State

court's decision on this claim "was contrary to, [and] involved an unreasonable

application of,  clearly established Federal law, as determined by the Supreme Court of

the United States."  <u>See</u> 28 U.S.C. § 2254(d)(1).  As such, this court should issue the

Great Writ mandating that Mr. Parr receive a life sentence or, if that relief is denied, a

new sentencing hearing.

## SEVENTH ISSUE FOR RELIEF

**PETITIONER'S RIGHT TO DUE PROCESS AND PROTECTION AGAINST CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED BY FAILURE TO DEFINE THE TERM "PROBABILITY", WHICH TERM IS INHERENTLY VAGUE, AND SUBJECT TO NUMEROUS INTERPRETATIONS**

## EIGHTH ISSUE FOR RELIEF

**PETITIONER'S RIGHT TO DUE PROCESS AND PROTECTION AGAINST CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED BY FAILURE TO DEFINE THE TERM "CRIMINAL ACTS OF VIOLENCE", WHICH TERM IS INHERENTLY VAGUE, AND SUBJECT TO NUMEROUS INTERPRETATIONS**

## NINTH ISSUE FOR RELIEF

**PETITIONER'S RIGHT TO DUE PROCESS AND PROTECTION AGAINST CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED BY FAILURE TO DEFINE THE TERM "SOCIETY", WHICH TERM IS INHERENTLY VAGUE, AND SUBJECT TO NUMEROUS INTERPRETATIONS**

The special issues in these matters have been set forth above. That issue includes several key terms, including probability, criminal acts of violence, and society. The meaning of those terms is far from clear, and there is no consensus regarding what the general definition would be. Nevertheless, the terms are not defined by the court; each juror is free to determine what the term means to them.

There should be no doubt that the first special issue is a statutory aggravator, that is, an affirmative answer is necessary to render a defendant eligible for the death penalty To prevent the arbitrary infliction of death, a statutory aggravating factor must channel the sentencer's discretion "by clear and objective standards that provide specific and detailed guidance" concerning the application of the factor. Godfrey, 446 U.S. at 428 & 437 (Marshall, J. concurring). When an aggravating circumstance fails to provide such "clear, objective, and specific standards" concerning its application and scope, it is invalid and cannot serve as the basis for death eligibility. Godfrey, 446 U.S. at 428-433; Maynard, 486, U.S. at 364.

In Jurek v. Texas, 428 U.S. 262 (1976), a plurality of the Supreme Court conditionally upheld the Texas capital punishment statute, while specifically acknowledging that the Texas Court of Criminal Appeals had not yet "defined precisely the meanings of such terms as 'criminal acts of violence' or 'continuing threat to society'" in the special issue. Jurek, 428 U.S. at 272 (Stevens, Stewart, Powell, JJ.). Years later, the Texas Court of Criminal Appeals has still not defined these vague terms.

Counsel recognizes that this claim has been consistently rejected.  However, Petitioner suggests the claim must be reviewed again, since the basis for the prior holdings has eroded. As discussed above, the Texas death penalty scheme has been attacked several times since it was approved in Jurek.  Before the decisions in Apprendi and Ring, the aggravating factor in capital murder cases was the circumstance in which the murder was committed; that is, murder in the course of committing robbery, burglary, sexual assault, or one of the other enumerated offenses. Petitioner suggests Apprendi and Ring, establish an additional aggravator; whether there is a probability the defendant will commit criminal acts of violence and be threat to society.

The significance of holding the first special issue is a statutory aggravator factor is that it is entitled to greater constitutional scrutiny. Compare Arave v. Creech, 507 U.S. 463 (1993) with Buchanan v. Angelone, 522 U.S. 269 (1998).  Petitioner suggests the corollary of that is that the issues must be sufficiently definite that the jury can make an intelligent decision.  In fact, when a federal court is asked to review a state court's application of an individual statutory aggravating or mitigating circumstance in a particular case, it must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer. If so, then the federal court must attempt to determine whether the state courts have further defined the vague terms and, if they have done so, whether those definitions are constitutionally

sufficient, *i.e.*, whether they provide some guidance to the sentencer." Bell v. Cone, 543

U.S. 447, 453 (2005).

Petitioner suggests that the terms in the first special issue, standing alone, provide

no restraint on the arbitrary infliction of the death penalty in Texas. For example, the

term "probability" itself has many meanings, each of which is different. In the true sense

of the word, there is a "probability" that everyone would commit "acts of violence" in the

future. For some persons, that "probability" may be extremely low, *e.g.*, 1:100,000,000,

but this is a "probability" nevertheless. There is no such thing as a "probability" per se,

but instead higher and lower probabilities, and circumstances dictate when an occurrence

becomes "a higher probability." "Probability" thus provides "no inherent restraint on the

arbitrary and capricious infliction of the death penalty." Godfrey, 446 U.S. at 428.

Depending on how "probability" is defined "an ordinary person could honestly believe

that every" defendant convicted of capital murder had a "probability" of committing acts

of violence in the future. Maynard, 486 U.S. at 364. In short, the first special issue did

not provide any restraint on the imposition of the death sentence here, because "a person

of ordinary sensibility could fairly characterize almost every [person]" already convicted

of capital murder as having some "probability" of "committing] criminal acts of violence

that would constitute a continuing threat to society." Without a narrowing definition, the

issue failed to distinguish between those who merit the death penalty under Texas law,

and those who do not.

The terms "criminal act of violence" and "society" fare no better. Some jurors may believe that only violent offenses such as murder and aggravated assault fit that definition. On the other hand, some jurors may be believe it covers any crime where there is a possibility of violence, such as burglary, theft and forgery. The term "society" is also a problem. Some jurors may consider that the society in which they live, while others may consider

Godfrey v. Georgia, 446 U.S. 420 (1980), which is very relevant here, applied this central tenet of Eighth Amendment law. The aggravating circumstance at issue there permitted a person to be sentenced to death if the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Godfrey, 446 U.S. at 422. The jury had been instructed in the words of the statute, but its verdict recited only that the murder was "outrageously or wantonly vile, horrible or inhuman." The Supreme Court of Georgia, in affirming the death sentence, held only that the language used by the jury was "not objectionable" and that the evidence supported the finding of the presence of the aggravating circumstance, thus failing to rule whether, on the facts, the offense involved torture or an aggravated battery to the victim. Godfrey, 446 U.S. at 426-27. Although the Georgia Supreme Court in other cases had spoken in terms of the presence or absence of these factors, it did not do so in the decision under review and this Court held that such an application of the aggravating circumstance was unconstitutional, saying: